UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HERCULES OEM GROUP and its
subrogated cargo insurers,

                                    Plaintiff,

                -against-

ZIM INTEGRATED SHIPPING SERVICES
LTD., et al.,

                                    Defendants.

Case No. 22-cv-02636 (JLR)

<u>**OPINION AND ORDER**</u>

JENNIFER L. ROCHON, United States District Judge:

Plaintiff Hercules OEM Group ("Hercules" or "Plaintiff") brings this lawsuit under the U.S. Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701, *et seq.*, against Zim Integrated Shipping Services Ltd. ("Zim") and Orient Star Transport International Ltd. ("OST" and, together, "Defendants"). *See generally* ECF No. 25 ("Am. Compl."). Hercules alleges that it purchased goods that were shipped by Defendants, and that Defendants are responsible for the water damage that the goods sustained while in Defendants' custody. *See id.* ¶¶ 11-15, Sch. A. Hercules moves for a partial summary judgment (i) that it has established its *prima facie* case under COGSA to recover damages, (ii) that the COGSA package for purposes of Zim's limitation of liability must be based on the number of cartons and not pallets shipped, and (iii) that the OST bill of lading limitation of liability is unenforceable under COGSA. *See generally* ECF No. 49 ("Mot."). For the reasons stated below, the motion is GRANTED in part and DENIED in part.

**BACKGROUND**[1]

**I.    Factual Background**

Unless otherwise noted, the following facts are undisputed.  Hercules contracted with

OST, a non-vessel operating common carrier ("NVOCC"), to transport a shipment of water-

meter machine parts (the "Cargo") from Shanghai, China, to Savannah, Georgia, pursuant to

OST's house bill of lading No. SHSAV2160254.  *See* Zim RSOF ¶¶ 4-5; ECF 52-10 ("OST

Front Side"); ECF No. 54-2 ("OST Bill of Lading").  OST, in turn, subcontracted with a shipping

company, Zim, to transport the shipment by sea, pursuant to Zim's master bill of lading No.

ZIMUSNH20939021.  *See* Zim RSOF ¶ 4; ECF No. 52-9 ("Zim Front Side"); ECF No. 54-1

("Zim Bill of Lading").

Because the Zim Bill of Lading and OST Bill of Lading are at issue in this case, the

Court will set forth the relevant provisions of both.  In a section called "DESCRIPTION OF

GOODS," the front side of Zim's Bill of Lading refers only to an "ATTACHED LIST," which

---

[1] In support of its motion for summary judgment, Plaintiff submitted: a declaration of Mindy
Nobles (ECF No. 51 or "Nobles Decl."), with an attached exhibit (ECF No. 51-1); a declaration
of Ginny LeBlanc (ECF No. 52 or "LeBlanc Decl."), with attached exhibits (ECF Nos. 52-1
through 52-11); a declaration of Ashley Merrett (ECF No. 53 or "Merrett Decl."), with attached
exhibits (ECF Nos. 53-1 through 53-4); an affirmation from David Loh (ECF No. 54 or "Yoh
Aff."), with attached exhibits (ECF Nos. 54-1 through 54-3); a Rule 56.1 statement of undisputed
facts (ECF No. 44 or "Pl. 56.1 Statement"); and a memorandum of law in support (ECF No. 50
or "Br.").

In opposition, Zim submitted: a declaration of Vincent DeOrchis (ECF No. 47 or "DeOrchis
Decl."), with attached exhibits (ECF Nos. 47-1 and 47-2); a declaration of Mark Newcomb (ECF
No. 48 or "Newcomb Decl."), with attached exhibits (ECF Nos. 48-1 through 48-8); a Rule 56.1
counterstatement (ECF No. 45 or "Zim RSOF"); and a memorandum of law in opposition (ECF
No. 58 or "Zim Opp.").  OST submitted: a memorandum of law in opposition (ECF No. 55 or
"OST Opp."), with attached exhibits (ECF Nos. 55-1 through 55-8), including a Rule 56.1
statement (ECF No. 55-1) and a Rule 56.1 counterstatement (ECF No. 55-8 "OST RSOF")).

Hercules then submitted a reply memorandum of law (ECF No. 59 or "Reply") and responses to
OST's Rule 56.1 statement and Zim's Rule 56.1 counterstatement (ECF Nos. 60 ("OST RCOF"),
60-1 ("Zim RCOF")).

further describes the Cargo as "1336 Cartons" of various water-meter machine parts (also listed).
Zim RSOF ¶¶ 11-12; *see also* ECF 52-9.  In a "PACKAGE LIMITATION AND
DECLARATION OF VALUE" section of its terms and conditions, the Zim Bill of Lading
provides that:

> If U.S. COGSA applies by virtue of Clause 4III, the liability of the
> Carrier and/or the Vessel shall not exceed US$500.- lawful money
> of the United States per package or customary freight unit. . . .  For
> limitation purposes under the Hague-Visby Rules or U.S. COGSA,
> it is agreed that the meaning of the word "package" shall be any
> palletized and/or unitized assemblage of cartons which has been
> palletized and/or unitized for the convenience of the Merchant,
> regardless of whether said pallet or unit is disclosed on the front
> hereof.

Zim Bill of Lading at 3; *see* Zim RSOF ¶ 9 (same).

Moving next to the OST Bill of Lading, under a "DESCRIPTION OF PACKAGES AND
GOODS" header, it states "1336 CARTON(S)" and refers to an "ATTACHED LIST" that
describes the same set of machine parts.  Zim RSOF ¶ 14; OST Front Side at 1.  Under a column
entitled "NO. OF CONT OR OTHER PKGS" it states "1 x 40'."  Zim RSOF ¶ 14; OST Front
Side at 1.  In a row titled "TOTAL NUMBER OF PACKAGES (IN WORDS)," the OST Bill of
Lading states "SAY TOTAL: ONE CONTAINER(S) ONLY."  Zim RSOF ¶ 14; OST Front Side
at 1.  In a "Limitation Amount" section of its conditions, the OST Bill of Lading states that:

> Compensation shall not, however, exceed 2 SDR (Special Drawing
> Rights) per kilo of gross weight of the goods lost or damage [sic],
> unless, with the consent of Carrier, the Merchant has declared a
> higher value for the goods and such higher value has been stated in
> the Bill of Lading, in which case such higher value shall be the
> limit.  However, Carrier shall not in any case, be liable for an
> amount greater than the actual loss to the person entitled to make
> the claim.

OST Bill of Lading § 9.3.  "Special Drawing Rights" ("SDR") are fluctuating units of currency set by the International Monetary Fund.  *See J.C.B. Sales Ltd. v. Wallenius Lines*, 124 F.3d 132, 134 (2d Cir. 1997).

The parties agree that COGSA governs their duties and responsibilities "from receipt of the cargo at the terminal at the port of loading in Shanghai, China to the delivery of the goods off the terminal at the port of discharge in Savannah, Georgia."  Zim RSOF ¶ 1; OST RSOF ¶ 1; *see* Zim Bill of Lading at 1 (stating that COGSA applies "[f]or shipments to or from or through the U.S.A." including the times "before loading on the Vessel or after discharge there from" and "including during carriage to or from a container yard or container freight station in or immediately adjacent to the sea terminal at the Port of Loading and/or Destination"); OST Bill of Lading § 8 ("All carriage under this Bill of Lading to or from the United States shall have effect subject to the provisions of [COGSA] . . . .  Except as may be otherwise specifically provided herein, said law shall govern before the goods are loaded on and after they are discharged from the vessel . . . and throughout the entire time the goods are in the custody of the carrier.").

The parties do not dispute that Hercules purchased the Cargo from a supplier in China, which packaged the Cargo into 1,336 cartons that were then, in line with Hercules's standard procedure, grouped into twenty-two shrink-wrapped pallets.  *See* ZIM RCOF ¶¶ 41-43; Zim RSOF ¶ 6.  Zim released an empty forty-foot container (the "Container") to Hercules and OST for loading on June 4, 2021.  Zim RCOF ¶ 28; *see* Newcomb Decl. ¶ 7.  The pallets were loaded into the Container, which was then closed, and a security seal number was placed on its door handle.  *See* Zim RSOF ¶ 6; Zim RCOF ¶ 30.  The parties agree that Zim had nothing to do with the loading of the Cargo into the Container.  Zim RCOF ¶ 29.  The Container was returned to Zim's possession at the Shanghai port on June 10, 2021.  *See* Newcomb Decl. ¶ 7.  The parties

dispute what happened to the Cargo and its condition before Zim took possession of the Container.  Plaintiff has produced a packing list from its supplier for the shipment, dated June 4, 2021, but points to no other documents or reports regarding the Cargo before its delivery to Zim. *See* Zim RCOF ¶ 44; ECF No. 52-3.  Zim, for its part, cites a public weather report to suggest that there was heavy rain in at least parts of Shanghai on the day that the Container was brought to the pier.  *See* Zim Opp. at 8.[2]

On June 12, 2021, Zim loaded the Container on one of its container ships in Shanghai. Zim RSOF ¶ 7.  The parties dispute whether the Container, while in Zim's custody, was ever in contact with the ground or a ship's deck where water could potentially accumulate.  *See* Zim RCOF ¶ 33.  They agree, however, that during this time, Zim could not see the Cargo inside or otherwise verify its condition.  *Id.* ¶ 32.  They also agree that all receipts that Zim received for the Container in China and at the Savannah port were "clean" of any notations or exceptions for apparent or obvious damage, such as water leaking out from under the Container doors or a tidemark on the outside of the Container walls.  *Id.* ¶ 34.

The Container arrived at the Port of Savannah on July 29, 2021.  *Id.* ¶ 46.  On or about July 31, 2021, the Container was picked up by TXN Intermodal ("TXN"), a trucking company that Hercules had engaged to transport the Container by truck from the pier in Savannah to Hercules's warehouse in Tallassee, Alabama.  *See* Zim RSOF ¶¶ 15-16.  Although containers are "usually brought straight to" Hercules's warehouse, TXN stored the Container at a depot for at least two days.  Zim RCOF ¶¶ 52-53.  On or about August 2, 2021, TXN delivered the Container

---

[2] The Court "may judicially notice a fact that . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  To the extent that the Court takes judicial notice of Zim's proffered weather report, *see* Zim Opp. at 8, it does so to note only that it rained at the Shanghai Pudong International Airport on June 10, 2021.

to Hercules's warehouse.  Zim RSOF ¶ 17.  TXN's truck driver did not note any issue with the Cargo's condition when he picked up the Container at the pier terminal, nor did he suggest that he observed any problems during his drive.  *See* Zim RCOF ¶¶ 47, 49.

Upon breaking the Container's security seal and opening its doors, Hercules noted water damage to each of the Cargo's twenty-two pallets.  Zim RSOF ¶ 18.  Each of the pallets showed a waterline.  *Id.* ¶ 19.  Some of the pallets had mold where they had been wetted.  *Id.*  Some of the cartons in the Cargo had lost their structural integrity.  *Id.*

The parties agree that the Cargo was wet, but dispute when and where it was wetted.  *See* Zim RSOF ¶ 20; Zim RCOF ¶¶ 38, 55.  Plaintiff concludes that, "[s]ince the flooding was quite extensive and had occurred recently," the damage must have occurred while the Cargo was in Defendants' custody.  Br. at 3.  Defendants respond that the condition of the Cargo suggests that the wetting "was long-term and not 'recent.'"  Zim Opp. at 11.

On August 4, 2021, a cargo surveyor inspected the Cargo on Zim's behalf at the Hercules warehouse and concluded that its wetting came from freshwater, not seawater.  Zim RCOF ¶¶ 59-60.  No one else tested the Cargo or its packaging for seawater.  *Id.* ¶ 61.

## II.  Procedural History

Plaintiff commenced this action on March 31, 2022, and amended its Complaint on May 26, 2022.  *See generally* ECF Nos. 1 ("Compl."), 25 ("Am. Compl.").  Zim answered the Amended Complaint on June 3, 2022, denying Plaintiff's allegations and asserting twenty affirmative defenses, including that any damage to the shipment occurred either before it was loaded onto the shipping vessel or after it was returned to Plaintiff, and that COGSA capped its liability at $500 per package.  *See generally* ECF No. 29 ("Zim Ans.").  OST filed a similar

answer on July 7, 2022.  *See* ECF Nos. 23, 30 ("OST Ans.").  The case was reassigned to the undersigned on September 27, 2022.  *See* ECF No. 33.

On January 17, 2023, Hercules moved for partial summary judgment.  *See* ECF No. 43; Mot.  OST and Zim filed their opposition to Plaintiff's motion and submitted accompanying documents on February 10, 2023 and February 15, 2023, respectively.  *See generally* OST Opp.; Zim Opp.  On March 1, 2023, Plaintiff filed its reply to Defendants' opposition briefs.  *See* Reply.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure ("Rule") 56, a moving party is entitled to summary judgment if, on any claim or defense, that party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  A "genuine" dispute is one in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" only if it "might affect the outcome of the suit under the governing law."  *Id.*

At summary judgment, the court's task is simply to "discern[] whether there are any genuine issues of material fact to be tried, not to decid[e] them."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  Therefore, "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment."  *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997).  The court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Est. of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).  Rule 56, however, "does not impose an obligation on a district court to perform an independent review of the record to find proof of a

factual dispute." *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002). It is instead the parties' responsibility to "point out" contested facts for the Court, and to "clarify the elements of the substantive law which remain at issue because they turn on contested facts." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (internal citation omitted).

## DISCUSSION

Plaintiff moves for partial summary judgment on three main points. First, Plaintiff seeks a summary judgment that it has established a *prima facie* case to recover against Defendants under COGSA because the nature of the damage to the Cargo is such that it must have occurred while in Defendants' custody. *See* Br. at 5-8. Second, Plaintiff seeks judgment that, for purposes of assessing COGSA's limitation on Zim's liability, the relevant "package" under the Zim Bill of Lading refers to each of the Cargo's 1,336 cartons, not its twenty-two pallets. *See id.* at 8-15. Third, for similar reasons, Plaintiff seeks judgment that the OST Bill of Lading's limitation-of-liability clause is invalid under COGSA. *See id.* at 15-18. Defendants oppose each of these arguments. *See* Zim Opp.; OST Opp. The Court will address each in turn.[3]

### I.    *Prima Facie* COGSA Case

Under COGSA, a plaintiff seeking recovery for damaged goods shipped pursuant to a bill of lading must first establish a *prima facie* case by "proving both delivery of goods to the carrier

---

[3] Plaintiff also argues that COGSA governed the parties' duties and responsibilities as to the shipment in this case "from the time the Container was received in the Port of Shanghai, China until the trucker . . . picked up the Container at the Port of Savannah." Br. at 5. Defendants appear not to dispute this claim. *See* Zim Opp.; OST Opp. Indeed, the parties have already agreed that COGSA governed here "from receipt of the cargo at the terminal at the port of loading in Shanghai, China to the delivery of the goods off the terminal at the port of discharge in Savannah, Georgia." Zim RSOF ¶ 1; OST RSOF ¶ 1; *see* Zim Bill of Lading at 1; OST Bill of Lading § 8. Therefore, the Court finds as a matter of law that COGSA applies in this case from the time that Zim received the Container at the Shanghai port to the time that TXN picked up the Container at the Savannah port. *See* 46 U.S.C. app. § 1312 (stating that COGSA governs "all contracts for carriage of goods by sea to or from ports of the United States in foreign trade").

. . . in good condition, and outturn by the carrier . . . in damaged condition." *Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005) (omissions in original) (quoting *Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration*, 137 F.3d 94, 98 (2d Cir. 1998)).

Generally, a plaintiff has two ways to make out such a case under COGSA. *See Transatlantic Marine Claims Agency*, 137 F.3d at 98. "First, the plaintiff may present direct evidence relating to the healthy condition of the goods at delivery and their damaged condition at outturn." *Id.* Second, the plaintiff can "show that the characteristics of the damage suffered by the goods justify the conclusion that the harm occurred while the goods were in the defendant's custody." *Id.* at 99. "[N]ot infrequently a plaintiff who is unable to provide specific evidence as to the condition of the goods at delivery or outturn, can nonetheless show, by the nature of the damage, that the injury complained of happened to the cargo while it was in the carrier's custody." *Id.* Once the plaintiff establishes a *prima facie* case, "the burden shifts to the defendant(s) to prove that one of the statutory COGSA exceptions to liability exists." *Id.* at 98; *see* 46 U.S.C. app. § 1304(2) (listing the statutory exceptions).

Hercules argues that it has established a *prima facie* case to recover against Defendants under COGSA as a matter of law because "the only reasonable conclusion – based on the undisputed facts here – is that the cargo must have been damaged while in the constructive care, custody and control of defendants." Br. at 8; *see id.* at 5-8. Defendants respond that Plaintiff has failed to prove either prong of the *prima facie* inquiry. *See* Zim Opp. at 14-21; OST Opp. at 4-6. At issue, then, is whether Plaintiff has demonstrated, as a matter of law, that the Cargo was (1) "in good condition" when it was delivered to Zim in Shanghai and (2) "in damaged condition" at the outturn when Zim discharged it to TXN in Savannah. *Atl. Mut. Ins. Co.*, 432 F.3d at 433

(internal citation omitted).  The Court will consider the evidence, viewed in the light most favorable to Defendants, as to each of these two time periods.[4]

## A.  Delivery

Hercules must "prove by a preponderance of the credible evidence that the (goods) were delivered to the vessel in good order and condition." *Atalanta Corp. v. Mediterranean Shipping Co. S.A.*, 426 F. Supp. 3d 67, 75 (S.D.N.Y. 2019) (quoting *Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 354 (2d Cir. 1981)); *see Caemint Food, Inc.*, 647 F.2d at 354 ("It is fair to impose on the plaintiff the burden of showing the condition of packaged goods on delivery because the shipper 'has superior access to information as to the condition of the goods when delivered to the carrier,' just as the carrier has superior access to information as to what happened thereafter." (internal citations omitted)). Without "direct proof that the item was in good condition upon delivery," a carrier can be liable "if there is evidence that the packaging of an item of cargo was damaged . . . while in the custody of the carrier, and corresponding damage to the cargo itself is discovered upon removal of the packaging." *Asoma Corp. v. M/V LAND*, No. 01-cv-01000 (JCF), 2002 WL 202170, at *3 (S.D.N.Y.), *aff'd*, 46 F. App'x 34 (2d Cir. 2002).

Hercules does not rely on direct evidence to argue that the Cargo was delivered to Zim in good condition.  *See* Br. at 5-8.  As Defendants note, Plaintiff has offered no direct evidence of the Cargo's condition at the time that it was delivered to Defendants at the Shanghai port on June

---

[4] OST also argues that it is not liable to Plaintiff under COGSA as a NVOCC because it did not physically handle or transport the cargo at issue.  *See* OST Opp. at 5-6.  While it may be true that OST did not itself transport the cargo, OST does not deny that it issued a bill of lading to Plaintiff.  "It is from the bill of lading – the NVOCC's contract with the shipper – that its liability to the shipper for its cargo derives."  *Scholastic Inc. v. M/V Kitano*, 362 F. Supp. 2d 449, 455-56 (S.D.N.Y. 2005); *see M. Prusman Ltd. v. M/V Nathanel*, 670 F. Supp. 1141, 1143 (S.D.N.Y. 1987) (finding that a "carrier" under the COGSA "must be read to include a party who, though not an owner or charterer of a ship, enters into a contract of carriage with a shipper and otherwise holds itself out to provide transportation of property for hire by water"). Therefore, OST is not exempt from liability under COGSA.

10, 2021.  *See* Zim Opp. at 1-2; OST Opp. at 2-3.  The parties' statements of undisputed facts

lack clarity as to the Cargo's condition when it was loaded into the Container and delivered to

Zim in Shanghai.  *See* ZIM RCOF ¶¶ 41-44; Zim RSOF ¶ 6.  Plaintiff concedes that Zim had

nothing to do with the loading of the Container, Zim RCOF ¶ 29, but otherwise does not provide

more details about the pre-delivery period, save for the fact that, on June 4, 2021, Zim released

an empty container, which was returned, six days later, closed and sealed with Hercules's Cargo,

*see id.* ¶ 28; Newcomb Decl. ¶ 7.  Plaintiff's statement that "the cargo was sealed into a forty

(40) foot container and the seal was not broken until delivery at the warehouse in Tallassee,

Alabama" tells the Court little about the Cargo's condition prior to its sealing.  Br. at 6; *see* Zim

RSOF ¶¶ 4, 6, 18; Zim RCOF ¶ 28.  The Court is not obligated to comb the record for clues as to

what may have happened to the Cargo before delivery, especially where Plaintiff offers little

evidence to dispute what Defendants claim is a genuine issue of material fact.  *See Amnesty Am.*,

288 F.3d at 470.  Meanwhile, the one piece of direct evidence present, the "clean" receipts that

Zim received for the Container in Shanghai, does not create a presumption of delivery in good

condition where the Cargo was shipped in a package – that is, in the Container – that would have

prevented the carrier from "observing the damaged condition had it existed when the goods were

loaded."  *Bally, Inc. v. M.V. Zim Am.*, 22 F.3d 65, 69 (2d Cir. 1994) (quoting *Caemint Food*, 647

F.2d at 352).

Plaintiff relies instead on a series of facts that it argues collectively shows that, "by the

nature of the damage, the injury complained of must have occurred while in defendants' care,

custody or control."  Br. at 6.  Plaintiff notes that the Cargo had "significant wetting damage"

when delivered at its warehouse, *see id.* (citing Merrett Decl. ¶ 7), and that some of the items and

their packing were still wet to the touch, *see id.* at 7 (citing Merrett Decl. ¶ 9).  Plaintiff also cites

TXN's confirmation both that the Container was never removed from the truck's chassis while in transit, and that the Container was not exposed to flooding while in TXN's custody.  *See id.* (citing Nobles Decl. ¶¶ 17-18).

To the extent that Plaintiff argues from these facts that the Cargo must have been delivered to TXN in damaged condition, the Court addresses that argument separately below. *See infra* Discussion § I(B).  With respect to the Cargo's initial delivery to Zim in Shanghai, however, these facts bear little weight on the first prong of Plaintiff's *prima facie* burden.  The Cargo could have been already damaged before its delivery to Zim, even if TXN did nothing to damage the Cargo further.  As for Plaintiff's statement that the Cargo was still wet in Tallassee, the parties dispute just how wet the Cargo was and whether that fact can determine when the Cargo was ultimately wetted.  *See* Zim RSOF ¶ 20; Zim RCOF ¶ 55.  A reasonable jury could conclude from the Cargo's condition at the warehouse in Tallassee that it was wet in China, prior to its delivery to Zim.

Additionally, the cases cited by Plaintiff do not support Plaintiff's arguments.  *See* Br. at 7-8.  In *Compagnie De Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corp.*, 316 F.2d 163 (5th Cir. 1963), the Fifth Circuit found a *prima facie* case met where the damage to stained glass "is such as to produce the external appearances found on discharge thus giving rise in turn to an inference that such damage was nonexistent at the time of loading."  *Id.* at 170.  The Court noted "more than ample evidence" justified this inference, namely that many of the external wooden crates "were twisted . . . had broken boards, and . . . were stained and discolored."  *Id.* at 168-69.  Here, because the Cargo was loaded in the Container, no damage was discerned until after the Container was opened at the warehouse.  *See* Zim RSOF ¶ 18.  At both ports, the Container was deemed free of apparent or obvious damage.  *See* Zim RCOF ¶ 34.

That fact, together with the recognition that no one noticed any external sign of damage to the Cargo on discharge, cannot support an inference that the Cargo necessarily was in good condition prior to delivery.

Plaintiff's reliance on *C. Itoh & Co. (America), Inc. v. Hellenic Lines, Ltd.*, 470 F. Supp. 594 (S.D.N.Y. 1979), is similarly unpersuasive.  *See* Br. at 7-8.  There, the Court could infer from water damage to leather boots packed only in cardboard boxes and a "clean bill of lading" that damage did not occur prior to delivery.  *Itoh & Co. (America), Inc.*, 470 F. Supp. at 597. Here, the cargo arrived to Zim already loaded in a sealed container, which was not opened until after it left Zim's custody.  As for *Transatlantic Marine Claims Agency*, *see* Br. at 8, the Second Circuit there concluded that the "nature of the damage – seawater wetting – was of the sort that inexorably justified the conclusion that the injury occurred at sea."  137 F.3d at 99.  Here, the damage resulted from freshwater, which precludes the Court from reaching the same conclusion. Zim RCOF ¶¶ 59-60; *see Am. Home Assurance Co. v. ZIM JAMAICA*, 296 F. Supp. 2d 494, 502 (S.D.N.Y. 2003) ("Evidence of freshwater wetting, unlike seawater wetting, of course does not justify a presumption that the damage occurred at sea.").

Drawing all permissible factual inferences in favor of Defendants, Plaintiff has not shown, as a matter of law for purposes of a *prima facie* case, that the Cargo was in good condition when it arrived at the Shanghai port.  *See, e.g.*, *Asoma Corp.*, 2002 WL 202170, at *3 (finding good condition upon delivery not established in part where no evidence was presented to "show that the goods were prepared and packaged in accordance with proper procedures and were carried to the ship under conditions that should have prevented any damage to the contents en route" (internal citation omitted)); *Perugina Chocolates & Confections, Inc. v. S/S Ro Genova*, 649 F. Supp. 1235, 1241 (S.D.N.Y. 1986) (declining to find delivery to carrier in good

13

condition where cargo was placed "in containers that were locked and sealed before delivery to the defendant" and was "exposed" to conditions "capable of damaging the goods" during transit to the carrier). The absence of information as to the condition of the Cargo prior to delivery precludes the Court from finding at the summary judgment stage that the Cargo was in good condition when Zim received it.

## B. Outturn

To prove the second prong of its *prima facie* case, Plaintiff must show that the Cargo was damaged at outturn, that is, "when Zim delivered the container[] to" Hercules's agent, TXN. *Bally, Inc.*, 22 F.3d at 69; *see Nissho-Iwai Co. v. M/T Stolt Lion*, 719 F.2d 34, 38 (2d Cir. 1983) (noting that outturn occurs "at the time of discharge"). Here, Hercules relies on the same facts as discussed above to argue that the Cargo was already damaged at this point. *See* Br. at 6-8. Plaintiff has not met its burden for this showing because the facts are disputed or otherwise insufficient.

First, as discussed above, the parties dispute when the Cargo might have become wet. Plaintiff assert that the wetting was "quite recent in the sense that the" Cargo and its packing were "still wet to the touch when received in Tallassee." *Id.* at 7 (citing Merrett Decl. ¶ 9). Defendants respond that the characteristics of the wetting suggest that it "was long-term and not 'recent.'" Zim Opp. at 11. The Court notes that the same warehouse manager who first examined the Cargo in Tallassee also testified that he "did not know where the contents of the container were wetted and could not reach a conclusion as to what actually caused the wetting." Zim RCOF ¶ 55. In any event, inferring when the Cargo might have gotten wet from how wet it was at the warehouse, or from the presence of mold, presents a factual question. *See Mondial United Corp.*, 316 F.2d at 170 (noting that the inference from "the external appearances found [on cargo] on discharge" as to when that damage occurred "is, by its very nature, a question of

14

fact"). Therefore, there is a fact dispute as to whether the Cargo became wet while in Zim's custody.

Second, the cargo surveyor's conclusion that the Cargo's wetting came from freshwater also undermines Plaintiff's assertion that the Cargo could have gotten wet only while in Zim's custody somewhere between Shanghai and Savannah. *See* Br at 7; Zim RCOF ¶¶ 59-60. "Freshwater wetting is not a uniquely maritime damage." *Am. Home Assurance Co.*, 296 F. Supp. 2d at 502. The Court concludes that the "characteristics" of the damage suffered here – freshwater wetting – do not on their own "justify the conclusion that the harm occurred while" the Cargo was in Defendants' custody. *Transatlantic Marine Claims Agency*, 137 F.3d at 99; *see Am. Home Assurance Co.*, 296 F. Supp. 2d at 503 (finding a genuine issue of material fact, albeit at the discovery prong, because "[a] reasonable jury could find that freshwater wetting was unlikely to occur while the cargo remained in defendants' custody").

Finally, Plaintiff's assertion that the Container "was never exposed to any flooding" while in TXN's custody is disputed. Br. at 7. The TXN officer who made that statement also testified in her deposition that she did not "know, or have any idea of, where the wetting to the cargo . . . might have happened." ECF No. 47-2 at 53:6-10; *see* Zim Opp. 8. Plaintiff also does not explain why TXN failed to bring the Container "straight to" Hercules's warehouse, as is its typical practice, but instead stored it at a depot for at least two days. Zim RCOF ¶¶ 52-53. Plaintiff notes that the Container "was never removed from the [truck's] chassis" but does not clarify why the Container went to the depot instead of directly to the warehouse. Br. at 7. At bottom, then, there is an issue of fact as to what happened to the Container while it was in TXN's custody. *See, e.g.*, *R.B.K. Argentina S.A. v. M/V Dr. Juan B. Alberdi*, 935 F. Supp. 358, 370 (S.D.N.Y. 1996) (finding that plaintiff failed to establish its prima facie case where there was a

"significant period of unaccounted-for time before the loss was discovered, but while the container was in the possession of plaintiff").  The Court cannot conclude, without accounting for what happened to the Container during a nearly three-day window, that there are undisputed facts sufficient to show that the Cargo was "in damaged condition" at outturn to TXN.  *Atl. Mut. Ins. Co.*, 432 F.3d at 433 (internal citation omitted).  A reasonable jury could conclude from the "unaccounted-for time" that the Cargo was damaged while in TXN's possession.  *R.B.K. Argentina S.A.*, 935 F. Supp. at 370.

Viewing the evidence in the light most favorable to Defendants, the Court finds that Defendants have cast enough doubt on Plaintiff's evidence to raise a genuine issue of material fact precluding summary judgment.  *See Transatlantic Marine Claims Agency*, 137 F.3d at 100 (noting that a defendant can defeat a COGSA prima facie case by attacking the plaintiff's evidence); *Am. Home Assurance Co.*, 296 F. Supp. 2d at 504 (finding that defendants' "answer to 'Where did the cargo get wet?'" that is, "'not while it remained in defendants' control,' . . . responds to the whole point of the prima facie requirements in COGSA . . . to establish that the damage to the goods occurred while under the supervision of the defendant" (second omission in original) (internal citation omitted)).  Therefore, the Court denies the summary judgment motion as to Plaintiff's *prima facie* claim under COGSA.

## II.   Liability Limitation

The Court turns next to Plaintiff's motion for summary judgment as to the limitations of liability in the Zim and OST bills of lading.

Under section 1304(5) of COGSA, a carrier shall not be "liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package . . . unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading," or the parties agree to a higher limit.  46 U.S.C. app. § 1304(5).

16

COGSA also provides that any bill of lading must show "[e]ither the number of packages or pieces, or the quantity or weight, as the case may be, as furnished in writing by the shipper." *Id.* § 1303(3)(b). Thus, if a shipper wishes "to protect its interest in the cargo beyond the package limitation amount, it ought to have contracted for that right." *Thyssen, Inc. v. S/S Eurounity*, 21 F.3d 533, 541 (2d Cir. 1994); *see Aluminios Pozuelo Ltd. v. S.S. Navigator*, 407 F.2d 152, 155-56 (2d Cir. 1968).

The Second Circuit has defined "package" as "a class of cargo, irrespective of size, shape or weight, to which some packaging preparation for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods." *Allied Int'l Am. Eagle Trading Corp. v. S.S. Yang Ming*, 672 F.2d 1055, 1057-58 (2d Cir. 1982) (quoting *Aluminios Pozuelo Ltd.*, 407 F.2d at 155). This definition is "broad enough to include a wide range" of items. *Binladen BSB Landscaping v. M.V. Nedlloyd Rotterdam*, 759 F.2d 1006, 1012 (2d Cir. 1985). But that definition does not clarify on its own, in the context of this shipment, which "package" constitutes the relevant package for assessing potential liability under COGSA. *See id.* ("In construing the statute we have had to evaluate diverse and occasionally idiosyncratic items shipped in various forms – bundles, boxes, cartons, bales, coils, crates, rolls, skids, pallets, and containers – in order to determine what units, if any, constitute COGSA 'packages.'").

The parties agree that the Cargo was shipped in some type of applicable "package," but dispute whether COGSA's $500 per package limitation applies here to the cartons holding the Cargo or to the pallets in which the cartons were loaded. *See, e.g.*, Br. at 9. Plaintiff argues that the 1,336 cartons of the machine parts were the COGSA packages, entitling it to damages for the full amount of its claim, which is less than $500 times 1,336 cartons. *See* Br. at 8-15, 17.

Defendants argue that the twenty-two pallets on which the cartons were shipped were the COGSA packages, thus limiting damages to $11,000 ($500 x 22 pallets).  *See* Zim Opp. at 21-26; OST Opp. at 7.

In this Circuit, the question of what constitutes the COGSA package "is largely and in the first instance a matter of contract interpretation."  *Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*, 775 F.2d 476, 485 (2d Cir. 1985) (citing *Yang Ming*, 672 F.2d at 1057, 1061).  "The most obvious place" to look first for "the intent of the contracting parties is, of course, the bill of lading."  *Id.* (citing *Binladen*, 759 F.2d at 1012).

To the extent that the parties "unambiguously identif[y]" the relevant "package" in the bill of lading, the Court "will adopt [that] unit of packaging."  *Seguros Illimani S.A. v. M/V POPI P*, 929 F.2d 89, 94 (2d Cir. 1991); *see Yang Ming*, 672 F.2d at 1061 (defining pallets as the COGSA unit of packaging where "in the bill of lading, the parties express agreement upon a number of 'packages' which counts only the pallets").  The number under the heading "NO. OF PKGS." is the "starting point" for this inquiry.  *Seguros Illimani S.A.*, 929 F.2d at 94; *see id.* ("[P]arties to bills of lading should expect to be held to the number that appears under a column whose heading so unmistakably refers to the number of packages.").  "In the event of ambiguity," courts "look elsewhere in the bill of lading and to other evidence of the parties' intentions."  *Id.* (citing *Allied Chem.*, 775 F.2d at 485-86).  "[T]he next best indication of the parties' intent," for example, are "the numbers reflected on the bills of lading that do refer to something that qualifies as a 'package.'"  *Id.* at 95.  Where the bill of lading's language remains inconclusive, the Court may consider outside evidence, such as on how the cargo was prepared for shipment.  *See, e.g.*, *Agfa Gevaert AG v. TMM Lines Ltd., LLC*, No. 04-cv-04202 (JFK), 2005 WL 2063836, at *6 (S.D.N.Y. 2005) (considering such evidence where the bill of lading's

language "does not clearly indicate the parties' intent"). Because ocean bills are contracts of adhesion, ambiguities are generally resolved against the carrier. *See Allied Chem.*, 775 F.2d at 486.

### A. Zim Bill of Lading

For the following reasons, the Court finds Hercules is not entitled to summary judgment that the 1,336 cartons constitute the packages here because it is clear from the Zim Bill of Lading that the COGSA "package" is instead each of the Cargo's twenty-two pallets. The Zim Bill of Lading "unambiguously identifie[s]" the Cargo's pallets as the COGSA "package." *Seguros Illimani*, 929 F.2d at 94. To be sure, the front side of the Zim bill of lading has no heading for "NO. OF PKGS." *See* Zim Front Side at 1. Absent any number under that heading – or any such heading at all – the only relevant numbers on the front side are those in the "attached list" that refer to 1,336 cartons. *See id.* at 2. However, the terms and conditions included on the reverse side of the Zim Bill of Lading expressly account for this absence, stating that, "[f]or limitation purposes under the Hague-Visby Rules or U.S. COGSA, it is agreed that the meaning of the word 'package' shall be any palletized and/or unitized assemblage of cartons which has been palletized and/or unitized for the convenience of the Merchant, *regardless of whether said pallet or unit is disclosed on the front hereof*." Zim Bill of Lading at 3 (emphasis added). The clause, also part of the bill of lading, amounts to an "explicit statement[]" between the parties defining the COGSA package. *Yang Ming*, 672 F.2d at 1057; *see Complaint of Maritima Aragua, S.A.*, No. 89-cv-05430 (JSM), 1992 WL 42256, at *5 & n.8 (S.D.N.Y. Feb. 21, 1992) (noting as indicative of the parties' intent, where a different number is listed under the "description of goods" category, that "the bills of lading provide that, for limitation purposes, the word package would include such items as pallets, skids, and other unitized loads"). That

package, the "palletized . . . assemblage of cartons" plainly refers to the twenty-two shrink-wrapped pallets on which the Cargo was loaded.  Zim Bill of Lading at 3.

Here, the parties have "express[ed] agreement" far more explicit than the contractual language on which the Second Circuit relied in *Yang Ming* to hold that pallets were the relevant package unit.  672 F.2d at 1061.  There, the Second Circuit relied on a line in the bill of lading that referred to the "Total Number of Packages or Units (in words)" as "Thirty (30) Packages Only."  *Id.* at 1056-57.  The Court found the case was "controlled" by this statement, noting that "[i]n order to reach a total of thirty, one must count the pallets as 'packages.'"  *Id.* at 1057.  While the parties in this case do not refer specifically to the number of COGSA packages, their written agreement is even more explicit in establishing the COGSA package "[f]or limitation purposes."  Zim Bill of Lading at 3.  The *Yang Ming* court had inferred from the parties' reference to a particular number to determine the COGSA package; here, the parties rely on no such inference to confirm the Cargo's "palletized . . . assemblage of cartons" as the relevant unit for liability limitation purposes.  *Id.*

Plaintiff argues that this language on the back of the Zim Bill of Lading is ambiguous because it "does not specify which grouping or assemblage is referenced."  Br. at 12.  As Plaintiff notes, "[n]either 'pallet' nor 'twenty-two' appear on [the] front side of the Zim bill of lading," an omission that, according to Plaintiff, precludes any "agreement that each of the twenty-two (22) pallets constitutes the COGSA package."  *Id.*; *see* Reply at 5.  COGSA, however, does not require a bill of lading to show the number of packages, so long as it includes the "quantity or weight" of the cargo.  46 U.S.C. app. § 1303(3)(b).  The Zim Bill of Lading includes both the quantity of the Cargo, 1,336 cartons, and its weight, 16,413.36 kilograms.  Zim Bill of Lading at 1-2.  More importantly, Plaintiff ignores the last part of the clause, which states

that the Cargo's "palletized and/or unitized assemblage of cartons" is the COGSA package "*regardless of whether said pallet or unit is disclosed on the front hereof.*"  Zim Bill of Lading at 3 (emphasis added).  This language confirms that the parties anticipated the possibility that the front of Zim's Bill of Lading would not include a reference to "pallet."  Therefore, Plaintiff cannot rely on the absence of such a reference to suggest ambiguity in the parties' intent.

Plaintiff also contends that the clause is vague because "it does not exclude items other than the pallet as the 'package' for COGSA limitation purposes."  Br. at 13.  While Plaintiff is correct that the clause does not "specifically exclude[] other items," from serving as a COGSA package, its suggestion that cartons are the appropriate unit clashes with the plain meaning of the clause's text.  *Id.*; *see* Reply at 5.  To count each of the Cargo's 1,336 individual cartons as a COGSA package would render extraneous the added condition that such packages consist of a "palletized" or "unitized assemblage" of cartons.  Zim Bill of Lading at 3.[5]  *See, e.g.*, *Harford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 558 (2d Cir. 2000) (noting in the context of a bill of lading under COGSA that "an interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable").

---

[5] Perhaps recognizing that the plain meaning of the Zim Bill of Lading cuts against its favored outcome, Plaintiff relies primarily on *Orient Overseas Container Line, (UK) Ltd. v. Sea-Land Service, Inc.*, 122 F. Supp. 2d 481 (S.D.N.Y. 2000), to argue that the "actual packaging of the cargo" could trump the bill of lading's contractual language in determining the COGSA package. Br. at 13-14.  But that case has little bearing on this one because it considered whether the COGSA package was the shipping container or the unpackaged engines inside.  *Orient Overseas Container Line*, 122 F. Supp. 2d at 489-90.  In determining the relevant COGSA package, this Circuit applies different standards for "container" cases and "non-container" cases.  *See, e.g.*, *Monica Textile Corp. v. S.S. Tana*, 952 F.2d 636, 640 (2d Cir. 1991) (rejecting "any notion that container and non-container cases were interchangeable" and stating that "they were then and remain now separate lines of authority").  Here, the case before the Court is a "non-container" case because the issue is whether the relevant "package" refers to the Cargo's pallets or its cartons.  *See, e.g.*, *Standard Electrica*, 375 F.3d at 944.

Even if the language of the bill of lading were not clear and unambiguous, other evidence supports the conclusion that pallets constitute the COGSA packages under the Zim Bill of Lading. The Court finds significant, for example, that Hercules, not Zim, used pallets to load the Cargo into the Container. *See* Zim RCOF ¶ 29. In *Standard Electrica, S. A. v Hamburg Sudamerikanische Dampfschifffahrts-Gesellschaft*, 375 F.2d 943 (2d Cir. 1967), the Second Circuit limited the plaintiff's liability to $500 per pallet for a shipment that consisted of nine pallets, each containing six cartons of television tuners. *Id.* at 944. The *Standard Electrica* court emphasized in part that the shipper, not the carrier, had been the one to "make up the cartons into a pallet, apparently for the reasons of greater convenience and safety in handling." *Id.* at 946. Focusing instead on the shipment's cartons, it noted, "would place upon the carrier the burden of looking beyond the information in the bill of lading or beyond the outer packing to investigate the contents of each shipment." *Id.* at 947.

Here, Hercules's standard procedure for "every shipment since day one" was to palletize the cargo, Zim RCOF ¶ 42, to "assist Hercules with respect to the efficiency and economy and warehousing of its products," *id.* ¶ 43, then shrink-wrap the pallets "so as to make them secure," *id.* ¶ 42. Zim took no part in palletizing the Cargo. *Id.* ¶ 29. Hercules's unilateral decision to group its cargo into pallets further suggests that pallets are the appropriate COGSA unit. *See Standard Electrica*, 375 F.3d at 946; *DCI Mgmt. Grp., Inc. v. M.V. Miden Agan*, No. 03-cv-00448 (DLC), 2004 WL 1078667, at *4 (S.D.N.Y. 2004) (noting as evidence of the parties' intent that "[the shipper] chose to pack the cartons onto the pallets – wrapping each pallet in plastic for easier handling and transportation" and "loaded the pallets into the container without any opportunity for [the carrier] to count the number of cartons"); *Menley & James Lab'ys Ltd. v M/V Hellenic Splendor*, 433 F. Supp. 252, 254 (S.D.N.Y. 1977) (finding pallets as the COGSA

22

package in part because the shipper decided to palletize the shipment, "such decision was made by the shipper exclusively in its own self-interest, with no regard for the interest of the carrier," and "the vast majority (and probably all) of the shipper's international shipments by sea were palletized"). It also demonstrates why the conventional justifications for resolving ambiguity in the bill of lading against the carrier do not apply in this case. *See Mitsui & Co., Ltd. v. Am. Exp. Lines, Inc.*, 636 F.2d 807, 822-23 (2d Cir. 1981) (declining to resolve ambiguity in the bill of lading against the carrier where the shipper supplied the number of packages and their description); *DCI Mgmt. Grp.*, 2004 WL 1078667, at *3 (same). If Hercules wishes "to protect its interest in the cargo beyond the package limitation amount, it ought to have contracted for that right." *Thyssen, Inc.*, 21 F.3d at 541.

Therefore, the Court finds that Plaintiff is not entitled to summary judgment that the COGSA packages are cartons for purposes of Zim's limitation of liability, given that the Zim Bill of Lading defines the twenty-two pallets as the packages for purposes of the limitation of liability.

### B. OST Bill of Lading

As for the OST Bill of Lading, the parties' briefs are less than clear about whether the Court should determine the COGSA package independently for two different bills of ladings issued for the same shipment. Plaintiff assumes, without providing a citation, that the Court should analyze the Zim and OST bills of ladings individually. *See* Br. at 16. OST seems to agree, relying in its brief on the terms and conditions on the back of its own bill of lading. *See* OST Opp. at 7-8. The Court notes that at least one other court has contemplated that two bills of lading can "set forth different provisions that would affect the amount of liability in the action." *St. Paul & Marine Ins. Co. v. Hanjin Shipping Co.*, No. 99-cv-01791 (KMW), 2001 WL 196754, at *3 (S.D.N.Y. Feb. 21, 2001). Therefore, given that they are separate contracts, the Court will

consider the OST Bill of Lading separately to determine the COGSA package for purposes of OST liability.

For the following reasons, unlike with respect to the Zim Bill of Lading, the Court cannot conclude from the OST Bill of Lading that pallets are the relevant COGSA unit for purposes of OST's limitation on liability.  The OST Bill of Lading differs from the Zim Bill of Lading in several respects.  Most importantly, it contains no clause defining "package" for COGSA limitation-of-liability purposes.  *See generally* OST Front Side; OST Bill of Lading.  In addition, unlike the Zim Bill of Lading, the OST Bill of Lading's headers do not refer only to a "DESCRIPTION OF GOODS," but specifically to a "DESCRIPTION OF *PACKAGES* AND GOODS," under which is printed "1,336 CARTON(S)."  OST Front Side (emphasis added).  Sections on the "NO OF CONT OR OTHER PKGS" and the "TOTAL NUMBER OF CONTAINERS OR PACKAGES" refer only to the one container in which the Cargo was shipped.  *Id.*  Finally, although the Zim Bill of Lading had referred in its terms and conditions to the "palletized and/or unitized assemblage of cartons," Zim Bill of Lading at 3, the word "pallet" or anything similar is absent from the OST Bill of Lading, *see* OST Front Side; OST Bill of Lading.

Read on its own terms, the OST Bill of Lading presents a question closer to that confronted by the Second Circuit's line of container cases, which considered whether the relevant COGSA package was the entire container or the shipment inside.  *See, e.g.*, *Mitsui*, 636 F.2d at 818-21 (holding that container is not the COGSA package when a bill of lading discloses on its face what is inside the container and those contents may reasonably be considered COGSA packages); *Binladen BSB Landscaping*, 759 F.2d at 1015 ("[I]f [the bill of lading] lists the container as a package and fails to describe objects that can reasonably be understood from the

description as being packages, the container must be deemed a COGSA package."); *Monica Textile Corp.,* 952 F.2d at 641 (noting that "[i]n non-container cases we have generally deferred to the parties' intent, as manifested by their bill of lading, in determining what unit is the relevant COGSA package" while "in container cases we must 'take a critical look' at clauses purporting to define the container as the COGSA package" (internal citation omitted)); *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 815 (2d Cir. 1971) (holding that a "package" is "more sensibly related to the unit in which the shipper packed the goods and described them than to a large metal object, functionally a part of the ship, in which the carrier caused them to be "contained"); *Smythgreyhound v. M/V Eurygenes*, 666 F.2d 746, 748 (2d Cir. 1981) (noting that the "question on appeal is whether the district court's decision limiting recovery to $500 per container should be upheld").

Here, because the number of cartons is described on the OST bill of lading, the container is not the COGSA package. *See Mitsui*, 636 F.2d at 821 ("[G]enerally a container supplied by the carrier is not a COGSA package if its contents and the number of packages or units are disclosed . . . ."); *Binladen BSB Landscaping*, 759 F.2d at 1013 (same); *Smythgreyhound*, 666 F.2d at 752 (same). The OST Bill of Lading discloses, in at least two places, the 1,336 cartons of which the Cargo consists. OST Bill of Lading at 1-2. The level of detail provided is sufficient to trigger the "presumption that the container is not the COGSA package." *Monica Textile Corp.*, 952 F.3d at 641 (citing *Mitsui*, 636 F.2d at 821). OST does not challenge this presumption or otherwise argue that COGSA liability should be limited to the one container. *See* OST Opp.

OST's argument that the freight rate supports a finding that pallets are the proper COGSA unit is unavailing. OST notes that the freight rate negotiated for the shipment, per its expert's declaration, "was based upon a 40 foot container load." OST Opp. at 7. To the extent

that this Court can consider this evidence in light of an otherwise unambiguous bill of lading, OST does not explain why the freight rate charged is significant.  If anything, the fact that Plaintiff was charged a straight freight rate for transport of the one container could "support[] the position that the parties agreed to the shipment of a single COGSA package," *Mapfre Atlas Compania de Seguros S.A. v. M/V LOA*, No. 15-cv-07876, 2017 WL 3332234, at *5 (S.D.N.Y. Aug. 3, 2017), which OST does not argue for and which is not supported by the face of the OST Bill of Lading.

OST also incorporates Zim's arguments, asking the Court to apply the same analysis to its own bill of lading.  *See* OST Opp. at 7.  But, as discussed above, the relevant COGSA package to determine Zim's liability turns on a wholly different bill of lading with distinct liability provisions and terms.  Absent additional language in the OST Bill of Lading's terms and conditions as was present in Zim, the COGSA packages for the OST Bill of Lading are the 1,336 cartons, the units that are set forth on the front of the bill of lading under "DESCRIPTION OF PACKAGES AND GOODS." OST Front Side at 1.

Having concluded that cartons are the COGSA package under the OST Bill of Lading, the Court agrees with Plaintiff that OST's limitation-of-liability clause is void.  Under COGSA, any "clause . . . or agreement in a contract of carriage . . . lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect."  46 U.S.C. app. § 1303(8); *see William H. McGee & Co. v. M/V/ Ming Plenty*, 164 F.R.D. 601 607 (S.D.N.Y. 1995) (allowing contractual liability limitation based on Special Drawing Rights to stand only because it was "not contrary to COGSA").  The parties agree that, under the OST Bill of Lading, pursuant to its cap on liability of 2 SDR per kilo, Plaintiff's maximum recovery is $31,893.80.  *See* Br. at 17; OST Opp. at 7.  However, applying COGSA's $500 per package limit to each of the

26

Cargo's 1,336 cartons, Plaintiff can recover a greater amount under COGSA.  Because OST's limitation-of-liability clause would lessen OST's liability under COGSA, it is not enforceable. *See* 46 U.S.C. app. § 1303(8); *Vimar Segiros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 534 (1995) (confirming that "[t]he liability that may not be lessened is 'liability for loss or damage . . . arising from negligence, fault, or failure in the duties and obligations provided in this section'" (quoting 46 U.S.C. app. § 1303(8))).

OST cites two cases in defense of its limitation of liability clause, but they do not upset the Court's conclusion.  Rather, they stand only for the proposition that OST's limitation-of-liability clause can survive when it limits liability to an amount greater than that permitted under COGSA's $500 per package limitation or when the parties expressly contract to raise the shipper's maximum liability.  *See* OST Opp. at 8-9 (citing *SPM Corp. v. M/V Ming Moon*, 965 F.2d 1297 (3d Cir. 1992); *William H. McGee & Co.*, 164 F.R.D. at 601).  They do not speak to whether such a clause applies when it lowers the liability available under COGSA.

Therefore, the Court grants Plaintiff's summary judgment motion as to OST's limitation-of-liability clause, holding the clause void under 46 U.S.C. app. § 1303(8).

## CONCLUSION

For the reasons stated above, Plaintiff's summary judgment motion is GRANTED in part and DENIED in part.  The Court grants Plaintiff summary judgment that the limitation-of-liability clause in the OST Bill of Lading is void.  The Court denies Plaintiff summary judgment as to its *prima facie* COGSA case and its claim that Zim's limitation of liability under COGSA should be based on the number of cartons instead of pallets.

IT IS FURTHER ORDERED that the parties shall, within **21 days from the date of this Order**, file a letter to the Court proposing next steps for the remainder of this litigation.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 49.

Dated: September 28, 2023
New York, New York

SO ORDERED.

_Jennifer Rochon_

JENNIFER L. ROCHON
United States District Judge